Scott A. Kamber
David A. Stampley
KamberEdelson, LLC
11 Broadway, 22nd Floor.
New York, NY. 10004
Telephone:      (212) 920-3072
*skamber@kamberedelson.com*
*dstampley@kamberedelson.com*

Joseph H. Malley
Law Office of Joseph H. Malley
1045 North Zang Blvd
Dallas, TX 75208
Telephone:      (214) 943-6100
malleylaw@gmail.com

David Parisi (SBN 162248)
Suzanne Havens Beckman (SBN 188814)
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone:      (818) 990-1299
dcparisi@parisihavens.com
shavens@parisihavens.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| JANE DOE, individually; NELLY VALDEZ-MARQUEZ, ANTHONY SINOPOLI, PAUL NAVARRO, individually and on behalf of a class of similarly situated individuals<br><br>            Plaintiffs,<br>v.<br>NETFLIX, INC., a Delaware Corporation, and DOES 1 THROUGH 50, inclusive,<br><br>            Defendants. | CASE No.<br><br>JURY DEMAND<br><br>CLASS ACTION COMPLAINT FOR:<br><br>1) Video Privacy Protection Act, 18 U.S.C. § 2710<br>2) Video Privacy Protection Act, 18 U.S.C. § 2710<br>3) California Consumers Legal Remedies Act, Civil Code § 1750<br>4) California Customer Records Act, Civil Code § 1798.80<br>5) California Unfair Competition Law, Business and Professions Code § 17200<br>6) California False Advertising Law, Business and Professions Code § 17500<br>7) Unjust Enrichment<br>8) Public Disclosure of Private Facts |

Plaintiffs Nelly Valdez-Marquez, Anthony Sinopoli, and Paul Navarro, on behalf of themselves and all others similarly situated, and Jane Doe on behalf of herself, by and through their attorneys, as and for Plaintiffs' complaint and demanding trial by jury, allege as follows upon personal knowledge as to themselves and their own acts and observations and, otherwise, upon information and belief based on the investigation of counsel, which Plaintiffs believe further investigation and discovery will support with substantial evidence.

## I.    NATURE OF THE ACTION

1.    On October 2, 2006, Netflix perpetrated the largest voluntary privacy breach to date, disclosing sensitive and personal indentifying consumer information. The information was not compromised by malicious intruders.  Rather, it was given away to the world freely, and with fanfare, as part of a contest intended to benefit its trusted custodian, Netflix.

2.    This right to privacy does not appear to be significant to Netflix.  This lawsuit is brought as a class action by and on behalf of similarly situated Netflix subscribers, qualified by the class definition and class period, whose privacy was violated by the actions of Netflix, Inc., ("Netflix") pursuant to their contest, "Netflix Prize." Jane Doe, a lesbian, who does not want her sexuality nor interests in gay and lesbian themed films broadcast to the world, seeks anonymity in this action. Paul Navarro files this action to prevent Netflix from going through with its announced intentions to make additional disclosures of personal identifying information including, but not limited to, users' video renting history and rating habits.

3.    Netflix knowingly authorized, directed, ratified, approved, acquiesced, or participated in the disclosure to third parties of the sensitive information and/or personal identifying information derived from the activity of the Netflix subscribers' online electronic communications, when they accessed the Netflix website to rent and rate videos.

4.    Netflix is an "Electronic Communication Service Provider" to its subscribers and knowingly disclosed to third parties the contents of Netflix's subscribers' communications, including but not limited to, subscribers' rental and rating videos information, while in elec-

tronic storage by that service, for the sole benefit of Netflix, without notice or consent to their subscribers.

**II.    JURISDICTION AND VENUE**

5.    Venue is proper in this District because Defendant Netflix's Terms of Service agreement with its subscribers includes a provision, "Disputes; Governing Law," which states:

> You and Netflix agree that the United States District Court for the Northern District of California and/or the California Superior Court for the County of Santa Clara shall have exclusive jurisdiction over any dispute between you and Netflix relating in any way to the Netflix service or Web site or these Terms of Use. You and Netflix expressly and irrevocably consent to personal jurisdiction and venue in these courts.

(*http://www.netflix.com/TermsOfUse*.)

6.    Venue is also proper in this district under 28 U.S.C. § 1391 (b)(2), because a substantial part of the events giving rise to the claims raised in this lawsuit occurred in this district.  Venue is also proper in California under 28 U.S.C. §§ 1391(b)(1) and (c) because Netflix is a corporation whose contacts, as alleged in this Complaint, are sufficient to subject it to personal jurisdiction.

7.    This Court has federal question subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1030, 18 U.S.C. § 2702, 18 U.S.C. § 2710, and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the California State Law claims pursuant to 28 U.S.C. § 1367.

8.    In the alternative, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332. The aggregate claims of plaintiff and the proposed class members exceed the sum or value of $5,000,000.00.

9.    This Court has federal question jurisdiction of this action under 28 U.S.C. §1331 because this action alleges violations of the Video Protection Privacy Act, 18 U.S.C. § 2710, a federal statute. The Court has supplemental jurisdiction over the remaining claims under 29 U.S.C. § 1367.

10.    Netflix is a Delaware corporation, headquartered in California, and is a citizen of the State of California. Plaintiffs are citizens and residents of Texas, and California, and as-

sert claims on behalf of a proposed class whose members are domiciled throughout the fifty states (including the 49 states besides California) and the U.S. territories. There is minimal diversity of citizenship between proposed class members and the Defendant.

11.    This Court also has personal jurisdiction over Defendant because (a) a substantial portion of the wrongdoing alleged in this complaint took place in the State of California; (b) Defendant Netflix's principal place of business is located in this state; and (c) Defendant is authorized to do business here, has sufficient minimum contacts with this state, and/or otherwise intentionally availed itself of the markets in this state through the promotion, marketing, and sale of its products and/or services in this state, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.    This Court has personal jurisdiction over the Defendant Netflix under Cal. Code Civ. Proc. § 410.10 because Netflix maintains its corporate headquarters in, and the acts alleged herein were committed in the State of California. Netflix is also subject to personal jurisdiction in California because Netflix perpetrated the unlawful conduct complained of herein, in part, within California; because the unlawful conduct complained of herein causes injury, in part, within California; because Netflix regularly conducts or solicits business, rents or leases office space within California, engages in other persistent courses of conduct and/or derives substantial revenue from goods and/or services used or consumed within California; and because Netflix regularly and systematically directs electronic activity into California with the manifested intent of engaging in business within California.

13.    The basis of the conduct complained of was devised, developed, implemented, and directed from within in this judicial district in the State of California. The actual information and data collected from Plaintiffs was, without exception, transmitted online to California by Netflix subscribers, and released by Netflix to the public from California. Therefore, substantial, if not all evidence of wrongdoing as alleged in this complaint is located in this judicial district.

## III.    INTRADISTRICT ASSIGNMENT

14.    Defendant Netflix Inc.'s principle executive offices and headquarters are located in this District at 100 Winchester, Los Gatos, CA 95032. Intra-district assignment to the San Jose Division is proper.

## IV.    PARTIES

15.    Plaintiff Nelly Valdez-Marquez is a resident of Bexar County, Texas. Valdez-Marquez is a representative of the "U.S. Resident Class," defined within Class Allegations.

16.    Plaintiff Anthony Sinopoli is a resident of Los Angeles County, California. Sinipoli is a representative the U.S. Resident Class and the California Resident Class, defined within Class Allegations.

17.    Plaintiff Paul Navarro is a resident of Dallas County, Texas. Navarro is a representative of the "U.S. Injunctive Class," defined within Class Allegations.

18.    Plaintiff Jane Doe is a resident of Franklin County, Ohio and files this action as an individual.

19.    Defendant Netflix, Inc. is a Delaware corporation that maintains its headquarters at 100 Winchester, Los Gatos, California 95032. Netflix does business throughout the United States and, in particular, does business in State of California and in this County. Netflix operates as an online DVD and Blu-ray disc rental service network, reported by Netflix on their website, *www.netflix.com*, as the "world's largest online movie rental service, with more than more than 10 million subscribers."  Netflix is a "video tape service provider," regulated by the Video Privacy Protection Act, "VPPA," 18 U.S.C. § 2710, meaning "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." § 2710(a)(4).

1    **V.     STATEMENT OF FACTS**

2         **A.  Netflix Collected Personal and Confidential Data on Movie Watching History**

3         **and Represented that It Was Private**

4         20.     Netflix subscribers access the Netflix website to rent movies, post comments on

5    the Netflix blog, and post ratings of movies. Netflix invites online subscribers to rate movies

6    based upon their preferences and Netflix responds by cataloging responses in order to recom-

7    mend movies that subscribers might prefer.

8         21.     Netflix subscribers provide personal information to Netflix to receive the movies

9    they choose. Subscribers may also contribute ratings of movies they have viewed. Netflix has

10   retained subscriber movie rental and rating data since Netflix starting doing business in 1998.

11        22.     Netflix subscribers' movie rental choices constitute personal information that

12   subscribers reasonably expect will be treated as presumptively confidential and that their rela-

13   tionships with Netflix are relationships of confidentiality. Netflix has been entrusted with the

14   confidential, sensitive, and personal information of millions of consumers.

15        23.     To some, renting a movie such as "Brokeback Mountain" or even "The Passion

16   of the Christ" can be a personal issue that they would not want published to the world. Robert

17   Bork, once considered for United States Supreme Court, found his video rental history leaked

18   to the press during debate over his nomination to the Supreme Court.  In large part because of

19   the unauthorized disclosure, the Video Privacy Protection Act was created.

20        24.     Netflix made numerous affirmative representations concerning the measures that

21   it purportedly had in place to protect the confidential, sensitive, and personal identifying infor-

22   mation of its subscribers from unauthorized disclosure. Netflix publicly touted its security of

23   consumer data to isolate its databases from unauthorized access, and represented that it placed

24   significant emphasis on maintaining a high level of security in order to protect the information

25   of its customers, touted its "state-of-the-art" security measures and facilities, and claimed to

26   protect the confidential, sensitive, and personal identifying information of its subscribers.

27

28

25.     At all times relevant to this complaint, Netflix published a privacy statement on its website at *http://www.netflix.com/Popup?id=5136*, which stated:

> This Privacy Policy explains our policy regarding the collection, use and disclosure of your personal information. As we update and expand our services, this policy may change, so please refer back to it periodically. By accessing our Web site or using our services, you consent to our information practices.
>
> . . .
>
> Collection and Use of Information
> Personal information means information that can be used to identify and contact you, specifically your name, postal delivery address, e-mail address, payment method (e.g., credit card or debit card) and telephone number, as well as other information when such information is combined with your personal information.
>
> When you register or re-register at our Web site, we ask you to supply us with personal information so that we can provide, enhance and personalize our services and marketing efforts. For similar reasons, we may supplement the personal information you provide with publicly available information about you.
>
> We keep track of your interactions with us, including but not limited to your site activity, DVD selections, movie ratings, payment history and correspondence as well as any instant movie viewing and related activity. We use this information for such purposes as providing recommendations on movies we think will be enjoyable, personalizing the site to better reflect particular interests, tracking your available instant-viewing hours, helping us quickly and efficiently respond to inquiries and requests and otherwise enhancing our service offering for our customers. We also provide analyses of our users in the aggregate to prospective partners, advertisers and other third parties. We may also disclose and otherwise use, on an anonymous basis, movie ratings, consumption habits, commentary, reviews and other non-personal information about customers.
>
> . . .
>
> Disclosure of Personal Information
> Except as otherwise disclosed to you, we will not sell, rent or disclose your personal information to third parties without notifying you of our intent to share the personal information in advance and giving you an opportunity to prevent your personal information from being shared.

26.     Netflix's definition of "personal information," quoted above, encompassed not only information such as name, address, account number, and telephone number, but also other information, "when such information is combined with your personal information."

27.     Netflix's privacy policy included the company's commitment to disclose changes to its privacy policies and practices, personally contact users regarding material changes, and obtain user consent to changes in use:

> Changes to This Policy

As we update and expand our services, we may make changes to this policy. You should check back for updates to this policy from time to time. If the changes result in materially less protection for your personal information than that provided in this policy, we will make reasonable efforts to contact you and obtain your consent to the changes. Like our Terms of Use, of which this policy is a part, your use of the Netflix Web site or continued use of our service after our efforts to contact you means that you agree to be bound by such changes.

28.     Netflix was in possession of—and was entrusted with—the confidential, sensitive, and personal indentifying information of millions of consumers, its customers. Netflix held itself out to the public as having particular skills and knowledge in the field of safeguarding such confidential information. Indeed, Netflix would not otherwise be entrusted with such information.

29.     Although Netflix touted its privacy protections to induce consumers to become subscribers, Netflix failed to disclose that it would release the movie titles, genres, rental dates, and ratings they assigned to movies, along with other information about their rentals—without consent—as fodder for a contest to improve the predictive value of their recommendation system.

**B.  Netflix Uses Software to Predict Future Movie Watching**

30.     Netflix offers subscribers recommendations about other movies the subscribers may be interested in renting. To make these recommendations, Netflix uses its proprietary recommendation software called "Cinematch." Netflix's Cinematch program uses a mathematical algorithm within its "recommender system" which combines data from a subscriber's selection of movies, genres, and ratings of movies, with other subscribers' similar data, to predict and "recommend" movie rentals. Cinematch employs collaborative filtering analysis to attempt to predict which movies will interest a subscriber. Cinematch uses collaborative filtering and compares an individual subscriber's information with characteristics of a large number of other subscribers. The predictive success of Cinematch is important in Netflix's efforts to increase revenue through movie rentals and promote user loyalty by providing better recommendations than its competitors. As stated by Netflix:

> Netflix is all about connecting people to the movies they love. To help customers find those movies, we've developed our world-class movie recommendation system: CinematchSM. Its job is to predict whether someone will enjoy a movie based on how much they liked or disliked other movies. We use those predictions to make personal movie recommendations based on each customer's unique tastes.

http://www.netflixprize.com/rules.

### C. Netflix Created a Contest to Improve Its Movie Recommendations

31.    In or about October, 2006, in an effort to improve the predictive accuracy of Cinematch, Netflix launched a contest offering a million-dollar top prize and other cash prizes to contestants who could provide collaborative filtering algorithms that predicted viewers movie ratings with greater accuracy than Cinematch. The contest was open to "anyone, any-where," with the exception of certain countries, and contestants could enter as teams. To re-ceive prize awards, qualifying contestants were required to disclose their analysis methods with Netflix and grant Netflix a non-exclusive license to use it. (*See http://www.netflixprize.com.*)

32.    Netflix provided registered contestants with two sets of data which were alleg-edly anonymized:

     a.    Contestants were given access to a "training data set." The training data set contained 100 million subscriber movie ratings. The ratings had been submitted by ap-proximately 480,000 subscribers between October, 1998 and December, 2005 for approxi-mately 18,000 movies. Each of the 100 million rating entries included a numeric identifier unique to the subscriber, movie title, movie year of release, date of subscriber rating, and the rating of one to five stars assigned by the subscriber.

     b.    Contestants were also given access to a "qualifying data set." The quali-fied data set contained 2.8 million ratings. Each entry contained a numeric identifier represent-ing the subscriber, movie title, and date of subscriber rating, but it did not include the rating as-signed by the subscriber. The actual subscriber ratings for the qualifying data set were known to the contest judges, who used the qualifying data set to assess the accuracy of contestants' pre-dictions in comparison to Cinematch's results.

33.     At one point, Netflix announced that 51,051 contestants on 41,305 teams from 186 different countries were participating in the contest and that Netflix had received 44,014 valid submissions from 5,169 different teams.

34.     Netflix terminated distribution of the contest data sets on July 26, 2009.

**D.  Well Before It Launched the Contest, Netflix Knew of the Risks in Publishing Anonymized User Data**

35.     The privacy risk posed by data mining of multiple Internet databases has been publicly discussed for nearly a decade.  Before Netflix launched its contest, it knew or should have known of risk based on the publicized incidents of de-anonymization of databases. (*See, e.g.,* L. Sweeney. Uniqueness of Simple Demographics in the U.S. Population, LIDAP-WP4. Carnegie Mellon University, Laboratory for International Data Privacy, Pittsburgh, PA: 2000 (available at *http://privacy.cs.cmu.edu/dataprivacy/papers/LIDAP-WP4abstract.html*, regarding use of 1990 census data to re-identify of patients in anonymized database released by Massachusetts Group Insurance.)

36.     Netflix should also have been aware that, only two months before Netflix launched its contest, AOL's research department released a compressed text file containing twenty million search keywords for over 650,000 users over a three month period. AOL attempted to anonymize the data by scrubbing identification data and IP addresses. In that case, it was not members of the computer science academic community, but reporters who identified individuals represented in the AOL database. (*See*, Barbaro, Michael & Tom Zeller, Jr.,. "A Face Exposed for AOL Searcher No. 4417749," *New York Times,* Aug. 9, 2009). Upon notice of the de-anonymization of their data, AOL ceased additional data releases.

**E.  Netflix Failed to Sufficiently De-Anonymize Its User Data**

37.     As reported by numerous press outlets, researchers reversed Netflix's anonymization process.

> In a dramatic demonstration of the privacy dangers of databases that collect consumer habits, two researchers from the University of Texas at Austin have shown that a handful of movie ratings can identify a person as easily as a Social Security number.

"Releasing the data and just removing the names does nothing for privacy. If you know their name and a few records, then you can identify that person in the other (private) database. "

The researchers -- graduate student Arvind Narayanan and professor Vitaly Shmatikov, both from the Department of Computer Sciences at the University of Texas at Austin -- claim to have identified two people out of the nearly half million anonymized users whose movie ratings were released by online rental company Netflix last year. The company published the large database as part of its $1 million Netflix Prize, a challenge to the world's researchers to improve the rental firm's movie-recommendation engine.

While Netflix's dataset did not include names, instead using an anonymous identifier for each user, the collection of movie ratings -- combined with a public database of ratings -- is enough to identify the people, the researchers argued in a <u>paper</u> published soon after Netflix released the data, but which only recently came to light. Narayanan and Shmatikov demonstrated the danger by using public reviews published by a "few dozen" people in the Internet Movie Database (IMDb) to identify movie ratings of two of the users in Netflix's data.

Exposing movie ratings that the reviewer thought were private could expose significant details about the person. For example, the researchers found that one of the people had strong -- ostensibly private -- opinions about some liberal and **gay-themed films** and also had ratings for some religious films.

Robert Lemos, *SecurityFocus* 2007-12-04, http://www.securityfocus.com/news/11497

38.   Netflix has conceded that identifying subscribers by number instead of name is insufficient to protect their identities from being deduced but claimed to have "prevent[ed] certain inferences from being drawn by perturbing, or altering data in the contest data sets. It sought to quell consumers' privacy concerns and privacy advocates' criticisms by making a show of masking the identifiability of the data through a process called "limited perturbation."

39.   According to James Bennett, Vice President of Recommendations Systems at Netflix and Stan Lanning, developer of Cinematch:

> To protect some information about the Netflix subscriber base [citation], a perturbation technique was then applied to the ratings in that dataset. The perturbation technique was designed to not change the overall statistics of the Prize dataset. However, the perturbation technique will not be described since that would defeat its purpose.

("The Netflix Prize," KDDCup'07, August 12, 2007, San Jose, California, USA, *http://www.cs.uic.edu/~liub/KDD-cup-2007/NetflixPrize-description.pdf*, citing Frankowski, D.,

*et al.*, "You Are What You Say: Privacy Risks of Public Mentions," Proceedings of SIGIR, 2006.) However, as the level of perturbation increases, the predictive value of the data decreases, which negatively impacts the purpose of the Contest.

40.     Since Netflix's concern was not the subscribers' privacy, but maximizing the benefits of the "Contest" for Netflix, perturbation was limited, at the expense of their subscribers' privacy. (*See http://www.cs.utexas.edu/~shmat/shmat_oak08netflix.pdf*).

41.     In fact, when the Contest started, Netflix contestants expressed concerns about Netflix subscribers' privacy, concerns heightened by the level of perturbation and level of privacy assurances—concerns to which Netflix responded disingenuously and dismissively:

> **Is there any customer information in the dataset that should be kept private?**
>
> No, all customer identifying information has been removed; all that remains are ratings and dates. This follows our privacy policy, which you can review here. Even if, for example, you knew all your own ratings and their dates you probably couldn't identify them reliably in the data because only a small sample was included (less than one-tenth of our complete dataset) and that data was subject to perturbation. **Of course, since you know all your own ratings that really isn't a privacy problem is it?**

http://www.netflixprize.com/faq (emphasis in original).

42.     Netflix knew, or should have known, of the privacy risks of releasing their subscribers' personal data by merely perturbing "some, but not all" sensitive and personal identifying information. Individuals and/or entities interested in re-anonymizing the data could merely use contextual and background knowledge, in addition to cross-correlation with publicly available databases. To re-anonymize the data, individuals and entities with no legitimate interest in the Contest could obtain Netflix subscribers data for purposes for re-identification of Netflix subscribers, and use such data for nefarious purposes, either commercial, personal, or otherwise.

43.     On information and belief, discovery will identify such individuals and entities, who registered for the contest and acquired the Contest data for their own purposes, separate and apart from the Contest.

**F.  Netflix Knew Early On that Its Subscriber Data Was Not Anonymous, Yet Netflix Did Nothing**

44.     Prior to October 18, 2006, at a time when Netflix claimed to have determined that the subscribers' data was perturbed sufficiently, such claims were extinguished when Netflix was informed that the Netflix Prize anonymity was broken. Within 16 days of the initial contest launch, Netflix received actual notice that its contest data had been de-anonymized by merging contest data with other data sources, such as the Internet Movie Database, *http://www.imdb.com*. (*See* A. Narayanan and V. Shmatikov, *How To Break Anonymity of the Netflix Prize Dataset,* arXiv:cs/0610105, Oct. 2006.)

45.     However, unlike AOL, Netflix did not withdraw the contest data. Instead, Netflix simply conceded the possibility of de-anonymization and responded that a contestant who utilized an external data would be disqualified from receiving a prize in the contest:

> [Netflix] Competition judge Charles Elkan at the University of California, San Diego, agrees that the method could work if enough Netflix users also use IMDB, but he believes it will be possible to detect and disqualify cheats when they submit their computer code.

*See* Merali, Zeeya, "Has Netflix given away the answers in its software competition?" Merali, Zeeya, *New Scientist,* 2577, November 11, 2006, p.32. Netflix continued to make the contest data available, including "for other noncommercial research purposes" such as the KDD Cup 2007, an annual Data Mining and Knowledge Discovery competition organized by ACM Special Interest Group on Knowledge Discovery and Data Mining.

**G.  The Second Netflix Contest**

46.     Netflix has announced a new contest in which the release of subscribers' information includes gender, zip code, and age of their subscribers. Netflix claims perturbation will be adequate to protect confidentiality if age is released but not date of birth.

47.     This sequel is to be the release of a larger database of sensitive and personal identifying information that had not been breached, compromised, hacked, stolen, nor accidently released.

> #1 2009-08-06 18:31:12
> prizemaster

Administrator
From: Netflix HQ
Registered: 2006-08-29
Posts: 179

**Netflix Prize 2 (Yes, a sequel!)**
This is Neil Hunt, Chief Product Officer at Netflix.

To everyone who participated in the Netflix Prize: You've made this a truly re-markable contest and you've brought great innovation to the field. We applaud you for your contributions and we hope you've enjoyed the journey. We look forward to announcing a winner of the $1M Grand Prize in late September.

And, like so many great movies, there will be a sequel.

The advances spurred by the Netflix Prize have so impressed us that we're plan-ning Netflix Prize 2, a new big money contest with some new twists.

Here's one: three years was a long time to compete in Prize 1, so the next con-test will be a shorter time limited race, with grand prizes for the best results at 6 and 18 months.

While the first contest has been remarkable, we think Netflix Prize 2 will be more challenging, more fun, and even more useful to the field.

Stay tuned for more details when we announce the winners of Prize 1 in Sep-tember.

http://www.netflixprize.com/community/viewtopic.php?id=1520

### H.  The Netflix Contests Benefit Netflix but Cost its Subscribers

48.     Netflix did it for the money.  Netflix's purpose in sponsoring the Netflix Contest was to obtain the benefit of "crowd-sourcing"—essentially, outsourcing a task to the public at large. For relatively low cost to Netflix, Netflix acquired extremely valuable academic research from highly skilled parties. The results Netflix obtained have significant commercial applica-tion and competitive value to Netflix. Netflix sponsored the contest and allowed it to continue in order to obtain this significant benefit for itself, despite the fact that doing so imposed unfair costs on its subscribers.

49.     Subscribers who provided personal information in the course of renting and rat-ing movies did not provide such information for Netflix to publicly disclose it in a contest and,

1   in the case of some subscriber transactions, to do so many years later. Nor was Netflix contem-

2   plating the contest when it collected much of the subscriber information used in the contest.

3   Thus, all of the subscriber information disclosed in the contest was disclosed for a purpose

4   other than that which subscribers provided it and, for the most part, for purposes other than that

5   for which Netflix collected it.

6          50.    Further, Netflix's use of any subscribers' personal information in the contest was

7   not for the purpose of marketing goods or services directly to that subscriber or any other pur-

8   pose that provides an exception from the prohibitions of the Video Privacy Protection act, Title

9   18, United States Code, Section 2710.

10         51.    To the extent Netflix collected any subscriber information in contemplation of

11  publicly disclosing it in a contest, Netflix neither disclosed this fact nor obtained subscriber

12  consent to such use. Netflix's privacy policy merely states, "We may also disclose and other-

13  wise use, on an anonymous basis, movie ratings, consumption habits, commentary, reviews and

14  other non-personal information about customers." Netflix's privacy policy also states, "By ac-

15  cessing our Web site or using our services, you consent to our information practices." Neither

16  of these states provide notice or establish subscriber consent to the conduct alleged in this com-

17  plaint.

18         52.    While Netflix's privacy policy does provide notice that Netflix may disclose cer-

19  tain "non-personal" information on "an anonymous basis," the contest databases consisted en-

20  tirely of personal information. Each movie selection and movie rating transactions was personal

21  information, reflecting a particular person's actions on a particular date and linked to the par-

22  ticular person by a unique identifier that permitted anyone else to identify all transactions asso-

23  ciated with that particular person. The fact that Netflix posted the data sets with unique ID

24  numbers in the place of names did not change the fact that it was posting personal information.

25  Subscribers' information in the contest data sets could be and was de-anonymized precisely be-

26  cause it was personal information.

27

28

CLASS ACTION COMPLAINT                    15

53.   Further, nothing in Netflix's privacy policy can be construed to have put subscribers on notice of the novel and unusual disclosure that Netflix would later devise—a contest, nor did the privacy policy serve to put subscribers on notice that Netflix would disclose so much of their personal information to the general public.

54.   Netflix subscribers reasonably expected their movie selection and ratings information would only be released where there was a legitimate and compelling need, or as required by law, or that Netflix subscribers reasonably expected to be notified of the purpose, uses, and intended recipients before it is released, and Netflix determined that subscribers whose data was used within the contest should not be offered the right to "opt-in," or to permit Netflix use of their data within the Netflix Contest.

55.   In light of Netflix's conduct in releasing and continuing to disclose subscriber data throughout the contest period, Netflix made material misrepresentations and/or material omissions likely to affect consumers' choices to use Netflix's service when it stated in its privacy policy that:

a.   "Personal information means information that can be used to identify and contact you . . . as well as other information when such information is combined with your personal information."

b.   "Except as otherwise disclosed to you, we will not . . . your personal information to third parties without notifying you of our intent to share the personal information in advance and giving you an opportunity to prevent your personal information from being shared."

c.   "If changes [to the privacy policy] result in materially less protection for your personal information than that provided in this policy, we will make reasonable efforts to contact you and obtain your consent to the changes."

56.   Netflix continued to engage in such material misrepresentations and/or omissions in that it continued to utter the statements made in its privacy policy while it continued to

make the contest data sets available after having received actual notice of the risks of de-anonymization of the contest data.

57.     Netflix knew, or should have known, of the de-anonymization risks of releasing subscribers' personal data with limited perturbation of data.

58.     Netflix knew, or should have known, that third parties with no legitimate interest in participating in its contest would acquire the contest data for those parties' own purposes of acquiring information about individuals.

59.     Netflix was aware of the risk of de-anonymization or re-identification of sub-scriber ratings data in combination with external data sources, particularly in light of the high volumes of data being disclosed by Netflix.

60.     Netflix failed to take precautions to protect personal consumer information from public disclosure, which caused or was likely to cause substantial injury to Plaintiffs. The per-sonal consumer information disclosed by Netflix may, in some cases, be combined with other publicly available data to identify individual consumers or expose them to the risk of identity theft. This injury is not offset by countervailing benefits to consumers or competition, and is not reasonably avoidable by consumers. Furthermore, this unfair trade practice runs counter to public policy. This practice was, and is, an unfair act or practice.

61.     Netflix's disclosure of subscribers' information was repeated, ongoing, and sys-temic during the period on or about October 2, 2006 through July 2009.

62.     Netflix disclosed the personal information of 100 million subscribers to over 51,000 individuals with no effective means of preventing or intent to prevent the further propa-gation of the information to other individuals.

63.     Netflix publicly disclosed private facts about subscribers by public disclosing the contest data sets, which contained details of subscribers' individual, unaggregated movie se-lection and movie ratings transactions, which are private facts and, because of the public dis-closure, would be rendered more identifiable, a circumstance which would be offensive and ob-jectionable to the reasonable person because of the personal and sensitive nature of subscribers'

movie selections. The private facts about subscribers disclosed by Netflix were not of any legitimate public concern.

### I. The "Brokeback Mountain" Factor

64. Plaintiffs and class members have a privacy interest and concern for release of their sensitive information and personal identifying information.

65. Plaintiffs' and class members' movie and rating data contain information of a more highly personal and sensitive nature. A Netflix member's movie data may reveal that member's private information such as sexuality, religious beliefs, or political affiliations. Such data may also reveal a member's personal struggles with issues such as domestic violence, adultery, alcoholism, or substance abuse.

> Our secrets, great or small, can now without our knowledge hurtle around the globe at the speed of light, preserved indefinitely for future recall in the electronic limbo of computer memories. These technological and economic changes in turn have made legal barriers more essential to the preservation of our privacy.

*Shulman v. Group W*, 18 Cal. 4th 200, 243-244 (1998) (Kennard, J., concurring).

66. The Plaintiffs' and class members' movie data and ratings, which were released without authorization or consent, have now become a permanent, public record on the Internet, free to be manipulated and exposed at the whim of those who have the Database.

67. Netflix was attempting to play a semantics game—"personal" information meaning pertaining to or concerning a particular person; however personal information is not limited to a Netflix subscriber's name. Netflix subscribers reasonably believe that no record would be released showing that they watched a dogmatic, controversial, or sexually explicit show, regardless of whether their actual name is known.

68. As one article noted about Netflix's contest and it's subscriber data, "[f]irst, his political orientation may be revealed by his strong opinions about 'Power and Terror: Noam Chomsky in Our Times' and 'Fahrenheit 9/11,' and his religious views by his ratings on 'Jesus of Nazareth' and 'The Gospel of John.' Even though one should not make inferences solely from someone's movie preferences, in many workplaces and social settings opinions about

movies with predominantly gay themes such as "Bent" and "Queer as folk" (both present and rated in this person's Netflix record) would be considered sensitive. In any case, it should be for the individual and not for Netflix to decide whether to reveal them publicly." A. Narayanan, V. Shmatikov, *How To Break Anonymity of the Netflix Prize Dataset*. arxiv cs/0610105, Oct. 2006.

69.    Netflix subscribers demanded privacy controls within the Netflix website to limit access by any party to their viewing habits, including limitations to their friends, let alone, access by the "world."

> Discussion Thread: Friends - and Connecting to "Strangers"
>
> **Anonymous said...**
> The only way I would ever be willing to participate in any of these community features would be if I could remain completely anonymous. This has been mentioned by myself and others a few times on this blog but it doesn't seem to be something Netflix wants to work on."
> July 21, 2007 11:31 AM

http://blog.netflix.com/

70.    Netflix failed to protect subscribers' privacy in any manner, offline, as evident by their lack of privacy controls online, including but not limited to, privacy controls, defaults settings, opt-in requirements, and the "movie privacy" control that was implemented eight (8) years after Netflix was started, provided no additional privacy protections, but did expose Netflix's knowledge of subscribers' interest to keep their viewing habits anonymous.

> **Saturday, July 7, 2007**
> **Movie Privacy (the sequel to "Hiding Movies")**
> After your overwhelming response a few weeks ago about keeping your Friends from seeing those pesky embarrassing titles (something with *Teletubbies* comes to mind, or it could be that lowbrow drive in classic...) we wondered whether there was anything we could do in the short-term to ease the suffering. Every time we had started working on the right implementation in the past, it seemed like the project got tabled for something more pressing. But today your trusty web engineer Mikey showed me that he had built a quick-n-dirty version of Movie Privacy. It's not pretty, but i have to admit, it does the trick.
>
> So, in a rather unNetflix-like way, we're just going to release it to Friends users in the next week or so. Let's see if this finally allows you to connect to folks you know slightly less well (or maybe too well), and for whom you absolutely

needed the ability to hide *some* titles. We've all read your comments and suggestions for how best to implement this. Trust me: *this isn't that*. It's not that we're not hearing your suggestions.."

http://blog.netflix.com/2007/07/hiding-movies-sequel.html

71. On information and belief, Netflix allowed adversaries, including but not limited to, entities with an expertise in "data mining" and "marketing" to obtain the Netflix dataset of Plaintiffs' and class members' data.

72. On information and belief, Netflix's failure to properly screen all contestants, inability to monitor the use or dissemination of the released data, nor ability to have the dataset returned, shall provide a fertile ground for nefarious purposes and substantial and perpetual harm to Plaintiffs and class members since the adversaries know what Netflix knows:

> Monday, September 10, 2007
> Netflix Knows I'm Gay
> "OK, so, I got a little email today from Netflix, touting all the bells and whistles they have added to their new-fangled "Community" section. So, I jumped over to check it out, even though I hardly ever use any of those features ... seriously, does anyone?
>
> Anyway, one of the new features is a list of, well, *lists*, made up of movies that you may want to watch. Now, being the all-knowing "movie guy" that I am, I don't really need Netflix (or Amazon, or Imdb ...) to tell me what to watch, but I took a gander anyway and here is what I found, verbatim. (And, I might add, I did not make any of this up ... well, except for my catty parenthetical comments): [Redacted]…."

http://moviedearest.blogspot.com/2007/09/netflix-knows-im-gay.html

**J.  Jane Doe**

73. Plaintiff Doe was a Netflix subscriber who rented and rated movies at times relevant to the allegations in this lawsuit.

74. Plaintiff Doe is a lesbian and is a member of a community in which that fact is not a matter of general, public knowledge, including at her children's' schools.

75. Netflix, in addition to genre selections ranging from "Action & Adventure" to "Thrillers," offers selections in its "Gay & Lesbian" genre, including categories such as Gay &

Lesbian Comedies, Gay & Lesbian Dramas, Gay & Lesbian Romance, Foreign Gay & Lesbian, Indie Gay & Lesbian, Gay, Lesbian, Bisexual, and LOGO.

76.    Plaintiff Doe believes that information tending to identify or permit inference of her sexual orientation constitutes sensitive and personal information. She believes that, were her sexual orientation public knowledge, it would negatively affect her ability to pursue her livelihood and support her family and would hinder her and her children's' ability to live peaceful lives within Plaintiff Doe's community.

77.    On a number of occasions, Plaintiff Doe has rented movies listed in the "Gay & Lesbian" section of Netflix's movie categories. On other occasions, she has searched for and rented specific titles of movies that would be considered to be "gay-themed."

78.    Plaintiff Doe expects that, due the nature of Netflix's business, she is entitled to expect Netflix to treat her personal information as information obtained in the context of a relationship of confidentiality.

79.    Plaintiff Doe does not want her movie selection or rating transactions to be included in any public disclosure of data for purposes such as the Netflix contest, regardless of any attempts by Netflix to anonymize or perturb the data.

80.    Plaintiff Doe does not believe that any statements in the Netflix Terms of Use or Netflix Privacy Policy at the time she became a subscriber or at any time since then constitute notice that Netflix might include her personal information in a publicly disclosed contest data set.

81.    Plaintiff Doe does not believe that, by her using Netflix's website and services, she has given any explicit or implicit consent to Netflix's use of her personal information in a contest data set.

82.    Plaintiff Doe would not have rated any movies on Netflix had she known that doing so might cause her personal information to be included in a contest data set.

83.    Plaintiff Doe will be irreparably harmed by Netflix's disclosure of her information in its upcoming contest.

1    **VI.    CLASS ALLEGATIONS**

2       84.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Nelly Valdez-

3    Marquez, and Anthony Sinopoli bring this action on behalf of the following class:

4              All Netflix subscribers that rented a Netflix movie and also rated

5              a movie on the Netflix website during the period of October 1998

6              through December 2005, residing in the United States ("U.S.

7              Resident Class").

8       85.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Anthony Sinopoli also

9    bring this action on behalf of the following subclass:

10             All Netflix subscribers that rented a Netflix movie and also rated

11             a movie on the Netflix website during the period of October 1998

12             through December 2005, residing in California ("California Resi-

13             dent Class"). All California Resident Class members are also

14             members of the U.S. Resident Class.

15      86.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Paul Navarro brings

16   this action on behalf of the following class:

17             All Netflix subscribers since 2006, residing in the United States

18             ("U.S. Injunctive Class").

19      87.    On behalf of the Classes, Plaintiffs seek equitable relief, damages and injunctive

20   relief pursuant to:

21             a.    Video Privacy Protection Act, 18 U.S.C. § 2710(c) (the "VPPA");

22             b.    Video Privacy Protection Act, 18 U.S.C. § 2710 (e).

23             c.    California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et*

24   *seq.*; and

25             d.    California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et*

26   *seq.*

27             e.    Common-law privacy tort of Public Disclosure of Private Facts.

28

88.     On behalf of the California Resident Class, in addition to the relief described above, Plaintiffs seek equitable relief, damages and injunctive relief pursuant to:

a.      California Customer Records Act, Cal. Civ. Code § 1798.80, *et seq.;*

89.     On behalf of the Injunctive Class, Plaintiffs seek only injunctive relief.

90.     **Persons Excluded From Classes:**  Excluded from the classes are 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; and 3) persons who properly execute and file a timely request for exclusion from the class and 4) the legal representatives, successors or assigns of any such excluded persons.

91.     Plaintiffs reserve the right to revise these class definitions of the classes based on facts they learn during discovery.

92.     **Numerosity:** The exact number of class members is unknown and is not available to Plaintiffs, but it is clear that individual joinder of all class members is impracticable. On information and belief, Netflix reported membership of about five (5) million members in 2006 and claimed half of members rated movies: thus the U.S. Resident Class and Injunctive Relief Class shall consist of about 2.5 million Netflix subscribers. According to recent U.S. Census estimates, approximately 12% of the US population resides in California. Assuming that Netflix's subscribers are distributed evenly across the US population, there are approximately 300,000 Netflix subscribers residing in California. Class members can be easily identified through Netflix's records.

93.     **Commonality**: Common questions of fact and law exist as to all class members and predominate over the questions affecting only individual class members. These common questions include:

a)   What was the Netflix Contest and how did it work?;

b)   What information did the Netflix Contest release to the Netflix contestants?;

c)   Was there proper or any notice, of the operation of the Netflix Contest to

consumers?

 d) Was there proper or any opportunity to decline the operation of the Netflix
   Contest provided to consumers?

 e) Whether Netflix subscribers, by virtue of their membership, had pre-
   consented to the operation of the Netflix Contest?;

 f) Whether Netflix owed the class members a duty by its collection of personal
   information under the Privacy Policy?;

 g) Whether Netflix breached such duties through the violation of its Privacy
   Policy?;

 h) Whether Netflix breached such duties through the violation of its Terms of
   Service?;

 i) Whether Netflix failed to fully and accurately disclose the provisions
   relating to having their class members' movie rentals and /or ratings released
   to third parties or others?;

 j) Whether, in light of its duties, Netflix's failure to disclose any release of
   subscribers' movie rentals and ratings to class members breach violated its
   duties to the class members?;

 k) Whether any Netflix contestants obtained the movie rentals and ratings
   information for nefarious purposes?;

 l) Whether Netflix's Privacy Policy represented that Netflix's services have
   characteristics, uses, and benefits, which they do not possess, in violation of
   the Netflix Privacy Policy?;

 m) Whether Netflix's Terms of Service represented that Netflix's services have
   characteristics, uses, and benefits, which they do not possess, in violation of
   the Netflix Terms of Service?;

 n) Whether Netflix's Privacy Policy represented that Netflix's services were of
   a particular standard or quality which they were not, in violation of the

CLASS ACTION COMPLAINT   24

Privacy Policy?;

o)  Whether, in light of the release of data of U.S. Resident Class members'
movie rentals and ratings, Netflix's conduct was a deceptive under the
practice?;

p)  Whether Netflix's release of the subscribers' data, to third parties, was in
violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq.?;

q)  Whether Netflix's release of the subscribers' data, to third parties, was in
violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2702,
et seq.?;

r)  Whether Netflix's release of the subscribers' data, to third parties, was in
violation of the Video Protection Privacy Act, 18 U.S.C. § 2710, et seq.?;

s)  Did the operation, function, and/or implementation of the Netflix Contest
violate the VPPA?;

t)  Whether Plaintiffs and members of the class are entitled to damages and/or
restitution and the appropriate measure of damages?; and

u)  Whether Plaintiffs and members of the class are entitled to injunctive and
other equitable relief?

94.    Common questions of fact and law exist as to all U.S. Injunctive Class members and predominate over the questions affecting only individual U.S. Injunctive Class members. These common questions include those questions listed above as well as the following:

a)  Whether Netflix will violate the VPPA if Netflix discloses subscribers' data,
as contemplated?;

b)  Whether a preliminary injunction is required to restrain Defendants, their
officers, agents, servants, employees, and attorneys, and those in active
concert or participation with any of them from transmitting any information
about U.S. Injunctive Class Plaintiffs or class members, including but not
limited to, video purchases, preferences, ratings, zip code, age and/or gender

of Netflix subscribers to any third party?;

c) Whether a preliminary injunction is required to restrain Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them from transmitting any information about Plaintiffs' or class members' video purchases, preferences, and ratings without fair, clear and conspicuous notice of the intent to transmit information, including a full description of all information for transmission?; and

d) Whether a preliminary injunction is required to restrain Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them from transmitting any information about Plaintiffs' or class members' video purchases, preferences, and ratings to any other websites, including Netflix without fair, clear and conspicuous opportunity to decline the transmittal prior to any transmission of data or information?

95.    **Typicality:** Plaintiff's claims are typical of the claims of other Class members, as Plaintiff and other Class members sustained damages arising out of the wrongful conduct of Defendant, or are threatened to sustain damage, based upon the same transactions which were made uniformly to Plaintiff and the public.

96.    **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs are familiar with the basic facts that form the bases of the proposed class members' claims. Plaintiffs' interests do not conflict with the interests of the other class members that they seek to represent. Plaintiffs have retained counsel competent and experienced in class action litigation and intend to prosecute this action vigorously. Plaintiffs' counsel has successfully prosecuted complex actions including consumer protection class actions. Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the class members.

97.   **Superiority**: The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the proposed class members. The relief sought per individual member of the class is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendant. Furthermore, it would be virtually impossible for the class members to seek redress on an individual basis. Even if the class members themselves could afford such individual litigation, the court system could not.

98.   Individual litigation of the legal and factual issues raised by the conduct of Defendant would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court.

99.   Given the similar nature of the class members' claims and the absence of material differences in the state statutes and common laws upon which the class members' claims are based, the Classes will be easily managed by the Court and the parties.

100.   The court may be requested to also incorporate subclasses of Plaintiffs, defendants, or both, in the interest of justice and judicial economy.

101.   In the alternative, the class may be certified because:

a)   the prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudication with respect to individual class members which would establish incompatible standards of conduct by defendant;

b)   the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c)   Defendants have acted or refused to act on grounds generally applicable to

the class, thereby making appropriate final and injunctive relief with respect to the members of the class as a whole.

102.   For these reasons, the proposed Classes may be certified under Rule 23 of the Federal Rules of Civil Procedure.

**Count I:**

**Disclosure of Video Records**

**Violation of the Video Privacy Protection Act**

**18 U.S.C. § 2710**

**(By Jane Doe individually, U.S. Resident Class and Injunctive Relief Class)**

103.   Plaintiffs and class members repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein. Plaintiffs bring this cause of action on behalf of themselves, the U.S. Resident Class and the Injunctive Relief Class.

104.   Based on the conduct alleged above, Netflix is a video tape service provider that disclosed and represented that it will further disclose subscribers' personally identifiable information, in that the VPPA defines "personally identifiably information" as that which "identifies a person as having requested or obtained specific video materials or services from a video tape service provider" and defines a "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale or delivery of prerecorded video cassette tapes or similar audiovisual materials."

105.   Netflix's disclosures in publishing the contest data sets included and are to include the titles of movies, is and was not for the purpose of marketing goods or services to the particular subscribers, are and were the subjects of the disclosed data, is and was not with subscribers' written consent, and is and was not in the ordinary course of Netflix's business.

106.   As alleged herein, Netflix has knowingly disclosed and will continue to disclose personally indentifying information pertaining to Plaintiffs and class members, in violation of 18 U.S.C. § 2710.

107.    Plaintiffs and members of the U.S. Resident Class have suffered harm as a result of Netflix's violations of 18 U.S.C. § 2710, and Plaintiff Doe and members of the Injunctive Relief Class will suffer harm, including paying service and other fees and charges to Netflix and suffering the public disclosure of their private information and the consequences thereof.

108.    The VPPA permits any person aggrieved by a violation of its disclosure rules to bring a civil action for damages in a federal court. Each incident in which Netflix provided personally identifiable information regarding a Netflix member as having requested or obtained specific video materials or services from Netflix is a separate and distinct violation of the VPPA, subject to the remedies provided under the VPPA, and specifically pursuant to 18 U.S.C. § 2710(c). Accordingly, Plaintiffs and members of the Classes seek preliminary and permanent injunctive, declaratory, and equitable relief as may be appropriate; statutory damages, actual damages, and disgorgement of any profits made by Netflix as a result of this violation, but no less than $2,500 for each aggrieved Plaintiff or class member; punitive damages as the Court considers just; and reasonable attorney's fees and other litigation costs.

**Count II:**

**Retention of Video Records**

**Violation of the Video Privacy Protection Act**

**18 U.S.C. § 2710**

**(By Jane Doe individually, U.S. Resident Class and Injunctive Relief Class)**

109.    Plaintiffs and class members repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein. Plaintiffs bring this cause of action on behalf of themselves, the U.S. Resident Class and the Injunctive Relief Class.

110.    On or before October 2, 2006 continuing through July 9, 2009, Defendant violated the Video Privacy Protection Act, Title 18, United States Code, section 2710(e), which requires a videotape service provider to destroy consumers' personally identifiable information

no later than one year from the date the information is no longer necessary for the purpose for which it was collected, in that:

        a.     Defendant has retained subscribers' movie rental and movie rating data since 1998;

        b.     Subscribers did not provide movie rental and movie rating personal information for purposes of Netflix's publicly disclosing that information, in unaggregated form, in a contest;

        c.     Netflix did not collect such movie rental and movie rating personal information from subscribers for purposes of using such information in a contest; and

        d.     Subsequent to Netflix's collection of such information, it did not seek or obtain Subscribers' explicit consent to continue to retain such information and disclose it, publicly, and in unaggregated form, in a contest.

      111.     Pursuant to 18 U.S.C. § 2710, which provides a civil action for any person aggrieved by a knowing or intentional violation of 18 U.S.C. § 2710, and because the violations set forth in this Count are comprised of different acts than the violations set forth in Count I, Plaintiffs and members of the Classes here separately seek preliminary and permanent injunctive, declaratory, and equitable relief as may be appropriate; statutory damages, actual damages, and disgorgement of any profits made by Netflix as a result of this violation, but no less than $2,500 for each aggrieved Plaintiff or class member; punitive damages as the Court considers just; and reasonable attorney's fees and other litigation costs.

## COUNT III

### Fraudulent, Unfair, and Deceptive Business Practices

### Violation of the California Consumers Legal Remedies Act

### Cal. Civ. Code § 1750, *et seq.*

### (U.S. Resident Class and Injunctive Relief Class)

      112.     Plaintiffs and class members repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein. Plaintiffs

1    bring this cause of action on behalf of themselves, the U.S. Resident Class and the Injunctive

2    Relief Class.

3         113.   California Civil Code § 1770 (the "Consumer Legal Remedies Act") prohibits

4    unfair methods of competition and unfair or deceptive acts or practices which result in the sale

5    of goods or services to any consumer that are unlawful. Cal. Civ. Code § 1770 prohibits,

6    among other unlawful acts or practices:

7              (a)(5) Representing that goods or services have sponsorship, approval, charac-

8              teristics, ingredients, uses, benefits, or qualities which they do not have . . .

9              (a)(7) Representing that goods or services are of a particular standard, quality,

10             or grade, or that goods are of a particular style or model, if they are of another.

11        114.   Netflix has violated Cal. Civ. Code §§ 1770(a)(5) and (7) by engaging in unfair

12   methods of competition or unfair or deceptive acts or practices including, but not limited to the

13   following:

14             a.    Representing that Netflix uses secure technology, privacy protection

15   controls and restrictions on employee access in order to safeguard its members' personal in-

16   formation;

17             b.    Representing that Netflix will keep its members fully informed, about

18   what it does with its members' personal information;

19             c.    Representing that Netflix's Internet service is safe, secure, and private;

20             d.    Representing that Netflix will not share a member's Netflix network in-

21   formation with any third parties;

22             e.    Representing that Netflix will not share a member's Netflix network in-

23   formation in a manner that personally identifies a user; and

24             f.    Other unfair, unconscionable, deceptive, or fraudulent conduct as al-

25   leged above.

26        115.   On information and belief, without the knowledge or consent of its members,

27   Netflix is continuing to gather personally identifiable information and there is no indication

28

CLASS ACTION COMPLAINT            31

1  that Netflix will stop this conduct in the future. Netflix's unlawful and unfair business prac-

2  tices will continue to cause members of the Classes.

3  116.    Pursuant to Cal. Civ. Code §§ 1780 and 1781, the Class members seek an order

4  enjoining Defendant's Consumer Legal Remedies Act violations alleged herein and the impo-

5  sition of a constructive trust on and restitution of property gained by the CLRA violations, and

6  court costs and attorney's fees under the CLRA (Cal. Civ. Code § 1780(d)).

**COUNT IV**

**Fraudulent, Unfair, and Deceptive Business Practices**

**Violation of the California Customer Records Act**

**Cal. Civ. Code § 1798.80,** *et seq.*

**(California Resident Class)**

12  117.    Plaintiffs and class members repeat and incorporate herein by reference the al-

13  legations in the preceding paragraphs of this Complaint, as if set forth fully herein. Plaintiffs

14  bring this cause of action on behalf of themselves and the California Resident Class.

15  118.    Cal. Civ. Code § 1798.81 requires that a business take all reasonable steps to

16  destroy or arrange for the destruction of a customer's records within its custody or control

17  which contain personal information which is no longer to be retained by the business.  This

18  may be done by erasing the information or modifying the personal information in those re-

19  cords to make it unreadable or undecipherable through any means.

20  119.    Cal. Civ. Code § 1798.81.5 requires businesses to implement and maintain rea-

21  sonable security procedures to protect the personal information of their customers.

22  120.    Netflix's release of subscriber data without the appropriate protections or modi-

23  fications to protect personal information contained in the database as alleged herein violated

24  Cal. Civ. Code §§ 1798.81 and 1798.81.5.

25  121.    Pursuant to Cal. Civ. Code § 1798.84, the California Resident Class Plaintiffs

26  and members seek damages, including statutory damages of $3,000 per violation together with

27  injunctive relief. The California Resident Class Plaintiffs and class members also seek attor-

28

ney's fees pursuant to Cal. Code Civ. Proc. § 1021.5, as well as such other and further relief as the Court deems just and proper.

**COUNT V**

**Untrue or Misleading Statements**

**Violation of the California False Advertising Law**

**Cal. Bus. & Prof. Code § 17500,** *et seq.*

**(U.S. Resident Class and Injunctive Relief Class)**

122.    Plaintiffs and class members repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein. Plaintiffs bring this cause of action on behalf of themselves, the U.S. Resident Class and the Injunctive Relief Class.

123.    The acts, omissions, and practices of Netflix alleged herein include untrue or misleading statements made in connection with the provision of services which were known, or which by the exercise of reasonable care should have been known, to be untrue or misleading, in violation of Cal. Bus. & Prof. Code § 17500, *et seq.* These untrue or misleading statements include, but are in no way limited to, the following:

a.    Representing that Netflix uses secure technology, privacy protection controls and restrictions on employee access in order to safeguard its members' personal information;

b.    Representing that Netflix will keep its members informed, clearly and prominently, about what it does with its members' personal information;

c.    Representing that Netflix's Internet service is safe, secure, and private;

d.    Representing that Netflix will not share a member's Netflix network information with any third parties not contemplated by the Netflix Privacy Policy;

e.    Representing that Netflix will not share a members Netflix network information in a manner that personally identifies a user; and

f.    Other untrue or misleading statements as alleged above.

124.    Plaintiffs and members of the classes have suffered harm and lost money or property as a result of Netflix 's violations of California Business and Professions Code § 17500, *et seq.*, including paying service and other fees and charges to Netflix and suffering the public disclosure and anticipated disclosure of their private information.

125.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs and the members of the classes seek restitution, disgorgement, injunctive relief and all other relief from Defendant allowed under Cal. Bus. & Prof. Code § 17500, *et seq*. Plaintiffs and members of the classes also seek attorney's fees pursuant to Cal. Code Civ. Proc. § 1021.5, as well as such other and further relief as the Court deems just and proper.

**COUNT VI**

**Fraudulent, Unfair, and Deceptive Business Practices**

**Violation of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200,** *et seq.*

**(U.S. Resident Class and Injunctive Relief Class)**

126.    Plaintiffs and class members repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein. Plaintiffs bring this cause of action on behalf of themselves, the U.S. Resident Class and the Injunctive Relief Class.

127.    By engaging in the acts and practices described herein, Defendant has committed one or more unfair business practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

128.    The acts, omissions, and practices alleged in the Complaint constitute a continuous course of unfair, unlawful, and/or fraudulent business practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*. including, but in no way limited to, the following:

a.      violation of 18 U.S.C. §§ 2710, *et seq.*;

b.      violation of 18 U.S.C. §§ 2702(a)(1) and/or (a)(2);

c.      violation of Cal. Bus. & Prof. Code § 22575, *et seq.*;

d.     violation of Cal. Civ. Code § 1750, et seq.;

e.     violation of Cal. Bus. & Prof. Code § 17500, *et seq.*;

f.     violation of Cal. Civ. Code § 1798.80, *et seq.;*

g.     public disclosure of private facts and other conduct in violation of the common law;

h.     Other unfair, unconscionable, misleading, or fraudulent conduct as alleged above.

129.    Plaintiffs and the class members have suffered harm and loss of money or property as a result of such unfair and unlawful business practices, including paying the service and other fees and charges to Netflix and suffering the public disclosure and anticipated disclosure of their private information.

130.    On information and belief, without the knowledge or consent of its members, Netflix is continuing to gather personally identifiable information and there is no indication that Netflix will stop this conduct in the future. Netflix's unlawful and unfair business practices will continue to cause Plaintiffs and members of the classes harm.

131.    Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiffs and the class members seek restitution, disgorgement, injunctive relief and all other relief from Defendant allowed under Cal. Bus. & Prof. Code § 17200, *et seq*. Plaintiffs and the class members also seek attorney's fees pursuant to Cal. Code Civ. Proc. §1021.5, as well as such other and further relief as the Court deems just and proper.

**COUNT VII**

**Unjust Enrichment**

**(By Jane Doe individually, U.S. Resident Class and Injunctive Relief Class)**

132.    Plaintiffs and class members repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein. Plaintiffs bring this cause of action on behalf of themselves, the U.S. Resident Class and the Injunctive Relief Class.

133.    Netflix benefited from its unlawful acts through the receipt of payments for Internet service from Plaintiffs and other members of the Classes. It would be inequitable for Netflix to be permitted to retain the benefit of these service fees, which were conferred by Plaintiffs and retained by Netflix.

134.    Netflix continues to benefit from their unlawful acts through the receipt of payments in connection with its proprietary search engine, which continues to index websites associated with the subscriber data. It would be inequitable for Defendant to be permitted to retain the benefit of these monies.

135.    Plaintiffs are entitled to the establishment of a constructive trust consisting of the benefit to Netflix of such payments from which Plaintiffs and members of the Classes may make claims on a pro-rata basis for restitution.

**COUNT VIII**

**Public Disclosure of Private Facts**

**(U.S. Resident Class)**

136.    Plaintiffs and class members repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein. Plaintiffs bring this cause of action on behalf of themselves and the U.S. Resident Class.

137.    By its conduct, Netflix has knowingly and intentionally caused the public disclosure of private facts concerning Plaintiffs and members of the U.S. Resident Class. These private facts are ones that a reasonable person would not wish disclosed and that are not newsworthy.

138.    Netflix's public disclosure of Plaintiffs' and class members' movie selections and ratings, which constitute personal and sensitive information,

139.    Plaintiffs and members of the U.S. Resident Class have suffered harm as a result of Netflix's public disclosure of private facts about them.

140.    Plaintiffs and members of the U.S. Resident Class are entitled to actual and punitive damages and injunctive relief for these torts.

**Prayer for Relief**

**WHEREFORE,** Plaintiffs and the class members respectfully pray that the Court enter judgment in their favor as follows:

1. Declaring that this action is a proper class action both nationwide and in California and certifying Plaintiffs as the representatives of their respective Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Declaring that Netflix has violated and is in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, (the "VPPA"), relating to the U.S. Resident Class and California Resident Class;

3. Declaring that Netflix has violated and is in violation of Cal. Civ. Code § 1770, et seq.;

4. Declaring that Netflix has violated and is in violation of Cal. Civ. Code § 1798.80, et seq.;

5. Declaring that Netflix has violated and is in violation of Cal. Bus. & Prof. Code § 22575, et seq.,

6. Declaring that Netflix has violated and is in violation of Cal. Bus. & Prof. Code § 17500, et seq.;

7. Declaring that Netflix has violated and is in violation of Cal. Bus. & Prof. Code § 17200, et seq.,;

8. Awarding U.S. Resident and California Resident Class Plaintiffs statutory and actual damages;

9. Awarding Plaintiffs and the Classes injunctive relief, including but not limited to, ensuring that Netflix no longer stores or maintains records of any kind associated with subscribers; movie rentals, preferences, and ratings for purposes not contemplated by the Netflix's Terms of Service;

10. Awarding Plaintiffs and the Classes injunctive relief, including but not limited to, ensuring that Netflix obligates the Netflix contestants to destroy all records in its possession, custody, or control;

11. Ordering Netflix to disgorge revenues and profits wrongfully obtained from the Netflix Prize disclosure;

12. Awarding Plaintiffs and members of the Classes punitive damages;

13. Awarding Plaintiffs and members of the Class costs, interest, expenses and attorneys' fees for bringing and prosecuting this action;

14. With respect to all counts, damages in an amount to be determined at trial; and

15. Granting such other and further relief the Court deems just and proper.

**WHEREFORE,** Plaintiffs and the U.S. Injunctive Class respectfully pray that the Court enter judgment in their favor as follows:

1. With respect to all counts, declare the action to be a proper class action and designating Plaintiffs and their counsel as representatives of this Class;

2. Declare that Netflix will violate the ECPA if Netflix discloses subscribers' data, as contemplated;

3. Declare that Netflix will violate the VPPA if Netflix discloses subscribers' data, as contemplated;

4. Declare that Netflix will violate the CFAA if Netflix discloses subscribers' data, as contemplated;

5. As applicable to the Class *mutatis mutandis*, granting a preliminary and permanent injunction restraining Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them from:

(1) transmitting **any** information about U.S. Injunctive Class Plaintiffs or class members, including but not limited to, video purchases, prefer-

1          ences, ratings, zip code, age and/or gender of Netflix subscribers to

2                any third party;

3                (2) transmitting **any** information about Plaintiffs' or class members'

4                      video purchases, preferences, and ratings without fair, clear and con-

5                      spicuous notice of the intent to transmit information, including a full

6                      description of all information for transmission;

7                (3) transmitting **any** information about Plaintiffs' or class members'

8                      video purchases, preferences, and ratings to any other websites, in-

9                      cluding Netflix without fair, clear and conspicuous opportunity to de-

10                     cline the transmittal prior to any transmission of data or information;

11          6. No damages are sought at present with respect to the U.S. Injunctive Class

12                Plaintiffs' claims;

13          7. Awarding Plaintiffs and members of the Class costs, interest, expenses and at-

14                torneys' fees for bringing and prosecuting this action;

15          8. Granting such other and further relief as the Court may deem just and proper.

16   Respectfully submitted,

17

18   DATED: December 17, 2009         By
                                         David C. Parisi

19   Scott A. Kamber
     David A. Stampley
20   KamberEdelson, LLC
     11 Broadway, 22nd Floor.
21   New York, NY. 10004
     Telephone:    (212) 920-3072
22   *skamber@kamberedelson.com*
     *dstampley@kamberedelson.com*
23
     Joseph H. Malley
24   Law Office of Joseph H. Malley
     1045 North Zang Blvd
25   Dallas, TX 75208
     Telephone:    (214) 943-6100
26   *malleylaw@gmail.com*

27   David Parisi (SBN 162248)
     Suzanne Havens Beckman (SBN 188814)
28

CLASS ACTION COMPLAINT                    39

Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone:    (818) 990-1299
dcparisi@parisihavens.com
shavens@parisihavens.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT                    40

1

## JURY TRIAL DEMAND

2

3

The Plaintiffs hereby demand a trial by jury of all issues so triable.

4

Respectfully submitted,

5

6

DATED: December 17, 2009            By: _____

7

David C. Parisi

Scott A. Kamber

8

David A. Stampley
KamberEdelson, LLC

9

11 Broadway, 22nd Floor.
New York, NY. 10004

10

Telephone:     (212) 920-3072
*skamber@kamberedelson.com*

11

*dstampley@kamberedelson.com*

12

Joseph H. Malley
Law Office of Joseph H. Malley

13

1045 North Zang Blvd
Dallas, TX 75208

14

Telephone:     (214) 943-6100
*malleylaw@gmail.com*

15

David Parisi (SBN 162248)

16

Suzanne Havens Beckman (SBN 188814)
Parisi & Havens LLP

17

15233 Valleyheart Drive
Sherman Oaks, California 91403

18

Telephone:     (818) 990-1299
dcparisi@parisihavens.com

19

shavens@parisihavens.com

20

21

22

23

24

25

26

27

28